# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| JENI PORCHE, and ) | |
| MARGARET L. HOSTY ) | |
| ) | |
| Plaintiffs, ) | Case No. 02 C 7707 |
| ) | |
| ) | |
| vs. ) | Judge Ronald A. Guzman |
| ) | |
| ) | Magistrate Judge Susan E. Cox |
| ) | |
| ROGER ODEN, ALBERT CHESSER, ) | |
| DEBRA BOYD, DEBRA CONWAY, ) | |
| STUART FAGAN, PAUL KEYS, PEGGY ) | |
| WOODARD, HARRY KLEIN, ) | |
| WILLIAM McGEE, KRISTI ) | |
| DeLAURENTIS, LORINE SAMUELS, ) | |
| KATHLEEN ORR, JACK BEAUPRE, ) | |
| BRUCE FRIEFELD, THOMAS ) | |
| STEPKE, DEBORAH HOLDSTEIN, ) | |
| RASHIDAH MUHAMMAD, JOYCE ) | |
| KENNEDY, and LORRAINE SIBBET, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Susan E. Cox, Magistrate Judge

Plaintiffs Jeni Porche and Margaret Hosty ("plaintiffs") move to obtain discovery sanctions against defendants: Roger Oden, Debra Conway, Stuart Fagan, Paul Keys, Peggy Woodard, Harry Klein, William McGee, Kristi DeLaurentis, Lorine Samuels, Kathleen Orr, Jack Beaupre, Bruce Friefeld, Thomas Stepke, Deborah Holdstein, Rashidah Muhammad, Joyce Kennedy, and Lorraine Sibbet ("defendants"), all of whom were faculty or staff at Governor State University ("GSU") during 2000 to 2002 and /or their counsel. Plaintiffs allege that defendants have failed to produce

1

documents ordered to be produced by this Court, have failed to preserve documents that defendants knew would be relevant, and have fabricated evidence in the process of disclosing documents for discovery. For the reasons that follow, the motion for sanctions against the defendants is granted [dkt. 221].

## I. BACKGROUND

Both plaintiffs enrolled as graduate students at GSU in the summer of 1999. From April to October 2000, plaintiffs worked on the GSU newspaper called "The Innovator." During that time, a number of articles were published in "The  Innovator" that were critical of GSU, its faculty, staff and administrators. Plaintiffs allege that as a result of their writings in "The Innovator"defendants unilaterally changed the graduation requirements regarding requisite courses and composition of their thesis committees. In 2002, plaintiffs filed this case alleging, among other claims, that defendants unlawfully retaliated against plaintiffs' exercise of their First Amendment rights  that resulted in their inability to complete their master's degree in English at GSU. Specifically, plaintiffs argue that defendants changed the rules by requiring the chair of their thesis committees to be tenured, or at least to be a tenure track member of the faculty. Plaintiffs allege that these changes made it nearly impossible for them to graduate because of either the tenured faculty's conflict with plaintiffs' journalistic activities or their unfamiliarity with the subject matter of plaintiffs' theses. Defendants, however,  maintain that these changes were made on all English masters candidates and that plaintiffs were not singled out in any way.

## II.  PROCEDURAL HISTORY

After plaintiffs filed their fourth amended complaint in November of 2007, defendants were

served with the First Request for Production of Documents on January 23, 2008.[1] Several of the requests for production were objected to by defendants. On May 9, 2008, the Court resolved all disputes requiring further production by defendants.[2] Despite the Court's ruling, one dispute later resurfaced in regard to request number 29 ("RFP 29"). That dispute became the subject of this motion.

RFP 29 states that "[a]ll documents referencing approval for proposed or actual student theses submitted or intended to be submitted in pursuit of a Master's Degree in English at GSU, including, but not limited to, the frontispieces of archived copies of such theses in the GSU Library" be produced.[3] At the May 9, 2008 hearing, following defendants' initial objection to RFP 29 as being overly broad and unduly burdensome,[4] the Court limited the request to the "title sheets of all theses," with "a list of the thesis, including the name of the candidate and the advisor."[5] During that hearing, defendants stated that these documents had already been produced and sent to plaintiffs in April of 2008.[6] In response, plaintiffs did not state otherwise and made no objection to limiting RFP 29, thus, the issue over RFP 29 appeared to be settled.

It was only in August 2008 that RFP 29 specifically came up again in communications between the parties.[7] The actual production that defendants said occurred in April, prior to the May 9, 2008 hearing, was not actually made until August.[8] Prior to August, all communications between plaintiffs and defendants referenced other specific discovery requests still pending and did not

---

[1]*See* First Request for Production ("RFP"), Plaintiffs' Motion and Supporting Memorandum for Discovery Sanctions ("PMDS"), Ex. B.
[2]Dkt. no. 205.
[3]RFP, PMDS, Ex. B.
[4]Def. Resp to RFP, PMDS, Ex. C.
[5]Tr. of Proceedings 48-49, May 9, 2008 (dkt. no. 205).
[6]Tr. of Proceedings 48 (dkt. no. 205).
[7]Pl. Letter to Def., Aug. 11, 2008, PMDS, Ex. E.
[8]Pl. Letter to Def., Aug. 11, 2008, PMDS, Ex. E.

3

mention RFP 29 or any lack of production relating to RFP 29. This is best illustrated by the following letters and exchanges between both parties that led up to the dispute over RFP 29.

On July 11, 2008, plaintiffs sent a letter requesting, among other discovery requests, a status on the "additional discovery"ordered by the Court back in May.[9] Defendants responded to that letter by agreeing to update plaintiffs' counsel the following week.[10] Two weeks later, having not received that update, plaintiffs sent another letter inquiring into the "additional discovery compelled by the order entered on May 9, 2008" and discussed seeking sanctions as a result of defendants' failure to comply with discovery.[11] Defendants then produced thirty-six title pages, which they called "frontispieces," and no approval forms relating to RFP 29.[12] In response to this production on August 11, 2008, plaintiffs specifically requested the documents relating to RFP 29, confirming that no approval forms (which plaintiffs called frontispieces) had been sent and stated that only thirty-six title pages were produced days earlier.[13]

By the end of August 2008 it had become evident, through the letters exchanged, that both parties had two different opinions as to what documents the "frontispieces" actually were. From those letters, it also became clear that the documents plaintiffs were seeking were actually a whole new class of documents called the "thesis approval forms."[14] These approval forms were what plaintiffs had been calling "frontispieces." Once this issue came to light, defendants stated in their August 15, 2008 letter that the "thesis approval forms" would be disclosed by the following week.[15] The following week, defendants produced about forty original thesis approval forms.[16] Thirty-one

---

[9]Pl. Letter to Def., July 11, 2008, PMDS, Ex. E.
[10]Def. Letter to Pl., July 14,2008, PMDS, Ex. E.
[11]Pl. Letter to Def., Aug. 7, 2008, PMDS, Ex. E.
[12]Pl. Letter to Def., Aug. 11, 2008, PMDS, Ex. E.
[13]*Id.*
[14]Def. Letter to Pl., Aug. 15, 2008, Defendants' Response to Motion for Discovery Sanctions ("DR"), Ex.D.
[15]*Id.*
[16]*See* PMDS, Ex. H.

of these forms were "final" thesis approval forms and ten were "proposed" thesis approval forms.[17] According to a list also produced by defendants, the production only covered forty of the 101 English master's candidates enrolled from 2000 to 2007.[18]   This was only 23% of the total production being sought because there would have been a total of 202 thesis approval forms, two for each student enrolled.[19] The forty forms produced to plaintiffs only included one version of the two forms for each student. Because all forty forms submitted to plaintiffs were originals, each form contained signatures for each member of the thesis committee. That included the two faculty readers, the faculty chairperson and the student submitting the approval form along with the title of the thesis. [20]

On August 29, 2008, because defendants had disclosed none of the remaining thesis approval forms, plaintiffs served defendants with a set of interrogatories to illicit the same information from the remaining 162 thesis approval forms.[21]  In October 2008, defendants responded to these interrogatories by producing twenty-seven more thesis approval forms. Of the twenty-seven thesis approval forms produced, only six were originals containing the signatures of each person involved on each thesis committee. The remaining twenty-one were not originals because the signature line was crossed out and all the names of the members on the thesis committees were hand-written in by one person. The forms were also not dated. When defendants produced these twenty-seven forms, they admitted that the remaining forms could not be found or produced and that the new forms being produced were based on information compiled by Dean Eric Martin because, defendants asserted, none of the defendants had any knowledge or direct access to the information required to answer the

---

[17]*See* PMDS, Ex. H.
[18]*See id.*
[19]PMDS, Ex. H.
[20]PMDS, Ex. H.
[21]Pl. First Interrogatories to Def., PMDS, Ex. I.

interrogatories.[22]

In response, plaintiffs wrote to defendants expressing their concern over the insufficiency of the production. Plaintiffs noted the lack of genuine authenticity of the forms and their concern over having Dean Martin, a non-party, essentially fill in the information that defendants argued, only weeks earlier, could not be obtained by the defendant faculty members on these committees.[23] In an email response on November 12, 2008, defendants explained that the defendant faculty no longer had access to the originals and that the information would be compiled by Dean Martin in a chart containing all the information plaintiffs sought in their interrogatories.[24] The email further stated that the chart would be authenticated by the defendant faculty readers and chairpersons as well as by the Dean.[25]

Following these email exchanges, defendants sent a revised answer to Plaintiffs First Set of Interrogatories. The revised response included a chart that provided the name of each master's in English candidate from 2000 to 2007, the name of each faculty member on his or her thesis committee along with the designation of whether the faculty member was tenured, tenure-tracked or neither (hereinafter referred to as "the Chart"). It should be noted that the Chart does not appear to be complete because it does not contain a full list of all readers and/or faculty members on each student's thesis committee, which was requested through plaintiffs' interrogatories.[26] From October until plaintiffs' filing of this motion there were no additional documents or original thesis approval forms produced to plaintiffs in regard to RFP 29.

---

[22]Def. Letter to Pl., Oct. 22, 2008, DR, Ex. G.
[23]Pl. Letter to Def., Nov. 10, 2008, PMDS, Ex. L.
[24]Def. Emails to Pl., Nov. 12-13, 2008, DR, Ex. I & J.
[25]Def. Emails to Pl., Nov. 12-13, 2008, DR, Ex. I & J.
[26]*See* Chart, DR, Ex. J.

## III. LEGAL STANDARDS

Under Rule 37 of the Federal Rules of Civil Procedure, a motion for discovery sanctions can be proper in two different situations. The first being for a failure to comply with a court order, oral or written, which has already been made to compel production.[27] The second being when a party destroys or fails to preserve evidence over which it has control and reasonably knows or could foresee would be material to a potential legal action.[28] In the present case, plaintiffs argue that defendants committed both actions warranting an award of sanctions for either violation.

Under Federal Rule 37(b)(2), a court has authority to sanction a party when that party has failed to comply with an order that compels discovery.[29]

> If a party ... fails to obey an order to provide ... discovery ..., the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following: ... an order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting the party from introducing designated matters in evidence.[30]

An order that is entered to compel discovery need not be a written one,[31] and need not forewarn that an award of sanctions may apply for failing to comply.[32] Instead, the award of sanctions is at the court's discretion and only requires that it be proportionate to the circumstances surrounding the failure to comply.[33]

There also exists a duty to disclose evidence that need not be initiated by a court order. The duty to disclose extends to all relevant evidence that is at issue in the litigation.[34] Pursuant to Rule 37(c)(1), a party may be sanctioned for failing to preserve or produce evidence when that failure is

---

[27]Fed. R. Civ. P. 37(b)(2).
[28] Fed. R. Civ. P. 37(c)(1).
[29]*Langley v. Union Elec. Co.*, 107 F.3d 510, 514 (7th Cir. 1997).
[30]*Langley*, 107 F.3d at 514.
[31]*Halas v. Consumer Serv. Inc.*, 16 F.3d 161, 164 (7th Cir. 1994).
[32]*Hal Commodity Cycles Mgmt. Co. v. Kirsh*, 825 F.2d 1136, 1139 (7th Cir. 1987).
[33]*Langley*, 107 F.3d at 515.
[34]*See* Fed. R. Civ. P. 26.

not harmless and is not substantially justified.[35] This duty not only has its foundation in federal statute, but also under the Rules of Professional Conduct that govern this Court.[36]

## IV.  DISCUSSION

Plaintiffs bring this motion for discovery sanctions claiming that defendants have violated Rule 37(b)(2) by failing to comply with the Court's May 9, 2008 order. Plaintiffs also allege that defendants violated Rule 37(c)(1) by failing to preserve evidence and by fabricating evidence during the course of discovery.

**A.  Failure to Follow an Order to Compel under 37(b)(2)**

Plaintiffs allege that defendants failed to comply with the order of May 9, 2008, when the Court compelled production of all thesis approval forms. In response, defendants explain that the order on May 9, 2008 did not compel production of the thesis approval forms but, instead, only compelled production of the title sheets for each student's thesis. On May 9, 2008, after the Court had gone through all but one of the disputed requests for production, the Court began its discussion of RFP 29 by reading it out loud to hear both parties present their positions on the request. The  following exchange ensued:

THE COURT: All documents for referencing approval for proposed or actual student

PCs [sic] submitted or intended to be submitted.[37]

MR. KOCH: I believe, your Honor, we had produced the title sheets of all of

these thesis, I believe a list of the theses, including the name of the candidate, and

I believe also the advisor.

---

[35]Fed. R. Civ. P. 37(c)(1).

[36]*See* N.D.  Ill. R. 83.53.3(a)(13).

[37]The Court acknowledges that the phrase "PC" actually refers to the word "thesis" and was merely transcribed incorrectly.

THE COURT: I think that's all he is entitled to.

MR. KOCH: Thank you, your Honor

THE COURT: So we're done with that. That was exactly how I was going to rule, ...[38]
This was the only reference made by the Court in regard to RFP 29 on that day. As the Court understands it, the order was to produce documents that defendants later admitted were produced in August as "title sheets." There was no mention of "frontispieces" or thesis approval forms specifically made.

While it is true that the actual request, RFP 29, describes the documents to be "approval forms," what the Court specifically ordered did not reference these forms.[39] Instead, the Court acknowledged that plaintiffs were only entitled to the "title sheets," and the description of the title sheets that followed was actually a description of the approval forms.[40] Looking only at the discussion in Court, therefore, does not alleviate the confusion as to what documents were indeed being compelled.

When an order is not written, as is the case here, the oral order must unequivocally direct a party to provide the requested discovery before sanctions can be in order.[41] The discussion on May 9, 2008 suggests that defendants' production of title sheets, that eventually occurred in August, was all that was required by court order. Nevertheless, RFP 29 actually requests the approval forms and not just the title sheets.[42] The Court recognizes that even though the documents described in its order were the thesis approval forms, these documents were called "title sheets." Therefore, due to these

---

[38]Tr. of Proceedings 48-49 (dkt. no. 205).
[39]*See id.*
[40]*See id.*
[41]*Halas,* 16 F. 3d. at 164.
[42]RFP, PMDS, Ex. B.

discrepancies between what the request states and what the Court ordered, along with the confusion as to what documents were the title pages and what documents were the frontispieces, the Court finds the order to compel the thesis approval forms was not unequivocally clear and, thus, does not warrant an award of sanctions for failure to comply. Therefore, the motion for sanctions pursuant to Rule 37(b)(2) is denied.

## B.  Failure to Preserve Evidence under 37(c)(1)

Plaintiffs also argue that defendants should be sanctioned for their failure to preserve and produce the original thesis approval forms as required under Federal Rule 37(c)(1). When a party fails to disclose certain evidence without substantial justification, that party will be barred from using that evidence at trial.[43] Spoilation of evidence can be sanctioned under both statutory construction as well as under the Court's inherent authority. Parties and attorneys are frequently called upon to preserve and produce documents that may be against their interest in a particular case.[44] By doing so, both parties uphold the integrity of our litigation system and inspire confidence in it.[45]

For a court to award sanctions pursuant to Rule 37(c)(1), the court must determine that: 1) the "failing to produce" party had a duty to preserve or produce documents; 2) the "failing to produce" party breached that duty or obligation to preserve or produce documents; 3) the culpability for the breach rises to a level of willfulness, bad faith or fault; 4) the party seeking production suffered prejudice as a result of the breach; and 5) an appropriate sanction can ameliorate the prejudice from the breach.[46]

*1.  Defendants Had a Duty to Preserve Thesis Approval Forms for all Students Seeking a*

---

[43]Fed. R. Civ. P. 37(c)(1).
[44]*Danis v. USN Commc'ns. Inc.*, No. 98-C-7482, 2000 WL 1694325 at *1 (N.D. Ill. Oct. 23, 2000).
[45]*Danis*, 2000 WL 1694325 at *1.
[46]*Wells v. Berger*, No. 07-C-3061, 2008 WL 4365972 at *6 (N.D. Ill. March 18, 2008).

*Master's Degree in English from 2000-2008 at GSU.*

This case was filed in 2002 alleging, among other claims, that defendants sought to prevent plaintiffs from fulfilling their graduation requirements through arbitrary regulations not required for all other students. Relevant to that claim are documents referencing what requirements were enforced on each student graduating with a master's in English. That includes requirements for completing a student's final thesis and requirements as to which faculty members could sit on each thesis committee. The relevance of these documents was only restated in the fourth amended complaint, which specifically alleges that the unilateral changes of course requirements placed on plaintiffs were not based on any written policies at GSU and not enforced on other students.[47]

The duty to preserve documents does not need a formal discovery request to be triggered, the complaint itself can be sufficient when it alerts a party that certain information is relevant and likely to be sought in discovery.[48] Looking at both complaints, the allegation involving plaintiffs' graduation and thesis committee requirements were obvious to trigger defendants' duty to preserve and maintain the thesis approval forms, which are required to be submitted by every master's in English candidate to graduate.[49]

A duty to preserve documents can also arise by statute.[50] Under the Illinois State Records Act, a state university is not only required to maintain records and documents but also to have in place a records management program which explains the systematic management of all records from their

---

[47]Fourth Amended Complaint at 4 (dkt. no. 178).

[48]*Bryant v. Gardner,* No. 07-C-5909, 2008 WL 4966589 at *14 (N.D. Ill. Nov. 21, 2008).

[49]*See* Muhammad Dep. 117:9-18, Nov. 19, 2008 (discussing requirements to graduate that included a thesis approval form be submitted by students), PMDS, Ex. K.

[50]*Danis,* 2000 WL 1694325 at *32 (discussing a duty to preserve documents under Rule 37 and under the Private Securities Litigation Reform Act, which allows sanctions only when there is a willful failure to comply with the statute, unlike Rule 37 that does not require a finding of a party's "willful" failure to comply).

creation to their disposition.[51] For purposes of complying with this law, GSU has its own records schedule policy that outlines the procedures and time frame to maintain students' records.[52] One of the policies contained in GSU's record schedule specifically deals with "student academic record files."[53] It states that all "[g]raduation applications and corresponding authorization documents ... be retained in the office for five years after the latest of final period of enrollment, then disposed of (without microfilming), provid[ed] no litigation is pending or anticipated."[54] It would seem that thesis approval forms and all other forms that authorize graduation would be included in these files. With no other explanation, that would mean that GSU's policy is to retain thesis approval forms for at least five years when no litigation is anticipated, and longer if litigation is pending or anticipated. Defendants have repeatedly failed to explain how this retention policy would apply, or not apply, to the documents being sought by plaintiffs. So the Court assumes that these documents would fall into the provision of the retention policy. For these reasons, the Court finds that defendants had a duty to preserve and produce all original thesis approval forms, whether proposed or final, in anticipation of discovery.

---

[51]Ill. Comp. Stat. 5§160/9 (2003).
[52]*See* GSU Records Management Policy, Pl. Reply, Ex. P.
[53]*See* GSU Records Schedule Item #214MA, Pl. Reply, Ex. P.
[54]GSU Records Schedule Item #214MA, Pl. Reply, Ex. P.

*2. Defendants Breached their Duty to Preserve all Thesis Approval Forms for Students from 2000-2008.*

Though defendants' production for RFP 29 was far below sufficient, it cannot be said that they willfully ignored it or refused to cooperate. It is clear that up until August of 2008, both parties considered the "frontispieces" to be different documents.[55] Only months later did both parties recognize and admit the need to produce the thesis approval forms for all students seeking a master's in English. In a letter dated August 15, 2008, defendants confirmed their intention to provide the thesis approval forms, which contained the signatures of all faculty members on each student's thesis committee in addition to the signature of the student submitting the thesis.[56] Defendants also confirmed that those documents would be produced and sent by the following week.[57] But so far only 23% of all original thesis approval forms have been produced.

By defendants' own admission, there are at least four or five copies of the form (depending on the form used at the time) that are made when the initial form is submitted by a student for approval. Defendants further concede that four of the five copies are with faculty or staff of the University. So it is not clear to the Court why none of those copies can be produced. Defendants argue that after searching all records of the English Department, all electronic records, and asking faculty defendants to assist in the search, they could not compile and produce more than the 23% of the originals. This inadequate production goes unexplained by defendants. It becomes especially troubling when considering the importance of these documents not only for purposes of this litigation but also in the context of a student's academic record. Furthermore, while defendants produced most of the

---

[55] Pl. Letter to Def., Aug. 14, 2008, PMDS, Ex. G.
[56] Def. Letter to Pl., Aug. 15, 2008, PMDS, Ex. G.
[57] *Id.*

information that would have been contained on the original thesis approval forms, or so they say on the Chart, they have provided no explanation as to how they obtained that information. Instead, defendants simply make an offer to authenticate the information provided in the Chart by having defendant faculty sign the Chart as a way to show its accuracy. Such an "authentication" would require defendant faculty, by memory alone, to identify each participating faculty member for each student's thesis committee over a span of eight years. That does not seem to be a plausible solution nor does it ensure accuracy.

Defendants' failure to take any affirmative action to retain these documents or any other documents containing the same information is unjustified and unexplained. Where there is no retention policy in place for preserving certain documents, a party can breach their duty by failing to create a retention policy.[58] Here, there was a retention policy in place for all "student academic record files," but there was still a failure to preserve documents. Moreover, defendants claim that defendant faculty do not have any "knowledge of or direct access to the information required to answer the interrogatories."[59] This makes their "authentication" of the Chart meaningless and even suspicious. For these reasons, the Court finds that defendants breached their duty to preserve and produce all original thesis approval forms for students enrolled from 2000 to 2008.

3. *Defendants' Breach Rises to the Level of Bad Faith.*

The next element in determining whether sanctions are proper requires the Court to determine whether defendants were at fault for their failure to preserve evidence. Fault does not require that the failure to preserve evidence result from a party's subjective state of mind.[60] It can also be the result

---

[58]*Larson v. Bank One. Corp*., No. 00-C-2100, 2005 WL 4652509 at *13 (N.D. Ill. Aug. 18, 2005).
[59]DR at 7.
[60]*Marrocco v. General Motors Corp.,* 966 F.2d 220, 224 (7th Cir. 1992)*; Larson,* 2005 WL 4652509 at *13.

of how objectively reasonable that party's conduct was in light of the circumstances.[61] Whether it be in the form of "extraordinarily poor judgement," "gross negligence," or "reckless disregard of a party's obligation," all three forms of fault can justify an award of sanctions.[62] Therefore, once a party is on notice that evidence in their possession is relevant to the pending litigation, the failure to prevent its destruction or failure to ensure its preservation moves from being negligent to bad faith.[63] This can be true even when destruction of such evidence is part of a routine policy.[64] At the same time, fault is not a catch-all for any minor blunder that a litigant or his counsel might make.[65] Instead, it requires that some objectively unreasonable behavior took place.[66]

Defendants are unable to explain how all the various copies of the thesis approval forms were lost. Their explanation is that many of the defendants have either left the school, retired, moved from the English Department or have passed away and, thus, no longer have control or access to the documents. In fact, the only defendant faculty still working in the English Department at GSU is defendant Rashidah Muhammad. Taking this explanation as tenable, it still completely fails to explain why defendant Muhammad is also unable to find many of the original documents when she was on the actual thesis committees. In fact, she was the Chairperson of several thesis committees and yet she has no copies of the thesis approval forms. Defendants fail to explain the circumstances leading to this failure and, without an explanation, the Court finds that defendants' conduct rises to the level of "reckless disregard" of their discovery obligation. Defendants have not only ignored their duty to preserve these relevant documents but they have also violated their own policy in doing so.

---

[61]*Marrocco,* 966 F.2d at 224; *Larson ,* 2005 WL 4652509 at *13.
[62]*Id.*
[63]*Krumwiede v. Brighton Assoc.,*No. 05-C-3003, 2006 WL 1308629 at *8 (N.D.Ill. May 8, 2006).
[64]*Krumwiede,* 2006 WL 1308629 at *8.
[65]*Danis*, 2000 WL 1694325 at *33.
[66]*Id.*

The fact that defendants continue to work with plaintiffs to compile alternative forms of the documents does not excuse or erase the level of fault that remains from the initial failure to produce. Taking into consideration the amount of time that has passed since the request was first made, in January of 2008, weighs in favor of finding gross negligence that rises to the level of fault.[67] Therefore, the Court finds that defendants have been grossly negligent, if not willful, in their failure to produce the original thesis approval forms.

*4.  Plaintiffs are Prejudiced from Defendants' Breach.*

For this Court to determine that plaintiffs have been prejudiced by defendants' failure to produce the original thesis approval forms, we need to consider the effect of defendants' "alternate" production of the Chart. With a majority of the original thesis approval forms apparently unretrievable, the Court is still unclear as to where defendants would have obtained the necessary information to fill out the Chart. To claim that the information on the Chart is essentially the same as the information on the original forms, there needs to be an objective way to verify it.

Defendants, however, are unable to explain the source of their information in making the Chart. They are unable to explain why the retention policy in place was ignored. They are unable to correlate the fact that none of defendant faculty have any knowledge or access to information to verify the Chart's accuracy with Dean Martin's ability to compile the information contained on the chart. These factors make it difficult for the Court to understand how plaintiffs are to rely on the Chart without being prejudiced.

Rather, the Court agrees with plaintiffs that they are prejudiced because they do not know

---

[67] *See Marrocco,* 966 F.2d 220 (finding that the party's clear record of delay amounted to contumacious conduct and that dismissal was an appropriate sanction).

16

where the information came from or how it was retrieved. Plaintiffs' claim is that the information on those originals forms proves that while plaintiffs were students at GSU, they were treated differently than other students. Plaintiffs need the original documents to make their case, and those are now unretrievable. Not only have defendants failed to produce the originals but they have also failed to show where they referenced information that was used to make the Chart. Moreover, even if this Court were to find that the Chart could be a substitute for plaintiffs, it must be noted that the Chart is incomplete. For example, for over 50% of the students, the faculty readers on each thesis committee are not identified. For all of these reasons, the Court finds that plaintiffs are prejudiced by defendants failure to produce original documents and would be prejudiced if they were requested to rely on the Chart submitted by defendants in place of the actual thesis approval forms.

*5. Defendants are Barred from Presenting Evidence not from Original Documents Already Produced and the Jury Will be Instructed as to Why this Evidence is Unavailable.*

When determining what type of sanctions are appropriate in response to a party's misconduct, the Court has broad discretion.[68] The Court's discretion is governed  by Rule 37(c)(1), which automatically allows for a party to be barred from using evidence that has not been disclosed.[69] Pursuant to Rule 37(c), the court also has broad discretion to apply other sanctions described under 37(b)(2).[70] For the same reasons that plaintiffs cannot base their conclusions on information that seems to originate from an unknown source, it would be unreasonable to allow defendants to make their arguments and conclusions based on that same information. To impress upon defendants the importance of its preservation duties, particularly being a public institution governed by statutes,

---

[68]*See Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 642-643(1976).
[69]Fed. R. Civ. P. 37(c)(1).
[70]Fed. R. Civ. P. 37(c)(1).

which mandate such preservation, the award of sanctions must serve to deter such misconduct from happening again.

Because the court is given broad discretion to choose an appropriate sanction given the unique factual circumstances involved in each case,[71] and pursuant to Rule 37(c)(1), the Court grants plaintiffs' motion for sanctions under 37(c)(2). The Court orders defendants barred from presenting any evidence found on thesis approval forms (*i.e.*, the Chart) that are not original documents already produced.

Furthermore, in order that the jury not draw any inference adverse to plaintiffs from the missing documents, the Court will inform the jury, pursuant to Rule 37(b)(2), that any missing documents are the result of defendants' failure to produce those documents.[72] Defendants are also ordered to pay plaintiffs' costs and fees for the filing of this motion.

### C. Allegation of "Fabricated" Documents Not Founded

As for the claim of fabrication of documents, the Court does not find that there was any attempt by defendants to "trick" plaintiffs into thinking that the forms provided in October were actually the originals. Defendants explained in a letter dated October 22, 2008, that because none of the defendants had the information to answer the interrogatories relating to the composition of the thesis committees, Dean Eric Martin would compile the information and produce it in response to the interrogatories.[73] For that reason, it does not appear that the information was ever intended to be provided as originals. The fact that defendants had the word "signature" crossed out on the forms and that the date was left blank further supports that finding. Therefore, despite the questionable nature

---

[71]*See Roadway Express Inc. v. Piper*, 447 U.S. 752,764-65 (1980).
[72]*See* Fed. R. Civ. P. 37(c); *see Danis*, 2000 WL 1694325 at *51.
[73]Def. Letter to Pl., October 22, 2008, DR to PMDS, Ex. G.

of defendants' production in regard to RFP 29, the Court accepts defendants' reasoning and does not find any evidence of fabrication.

## V. CONCLUSION

For the reasons set forth above, while the court denies plaintiffs' motion for sanctions under Rule 37(b)(2), the Court grants an award of sanctions under Rule 37(c)(1) against defendants for failing to preserve and produce evidence to plaintiffs. The Court hereby orders that the information produced on the Chart by defendants be barred from use at trial and only original documents produced be admitted. Plaintiffs are to prepare paperwork for the Court's review regarding the awarding of fees and costs for preparation of their motion for sanctions on or before March 6, 2009.

**IT IS SO ORDERED**

**ENTERED: February 27, 2009**                  _____

                                                **Susan E. Cox**
                                                **UNITED STATES MAGISTRATE JUDGE**

19